**[J-35-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| UNITED BLOWER, INC. | : | No. 3 MAP 2021 |
| | : | |
| | : | Appeal from the Order of |
| v. | : | Commonwealth Court at No. 1383 |
| | : | CD 2019 dated July 13, 2020 |
| | : | Affirming the Order of the Lycoming |
| LYCOMING COUNTY WATER AND | : | County Court of Common Pleas, |
| SEWER AUTHORITY | : | Civil Division, dated August 20, 2019 |
| | : | at Nos. CV-15-00619 & CV-15- |
| G.M. MCCROSSIN, INC. | : | 00623. |
| | : | |
| | : | ARGUED: May 18, 2021 |
| v. | : | |
| | : | |
| | : | |
| LYCOMING COUNTY WATER AND | : | |
| SEWER AUTHORITY | : | |
| | : | |
| | : | |
| APPEAL OF: LYCOMING COUNTY | : | |
| WATER AND SEWER AUTHORITY | : | |

**OPINION**

**JUSTICE WECHT**                                **DECIDED: September 22, 2021**

In a case of first impression, we granted review to determine whether the

Commonwealth Court properly calculated the "cost" of steel products under the Steel

Products Procurement Act ("Steel Act" or "the Act"),[1] which requires that "75% of the cost

of the articles, materials and supplies [of a steel product] have been mined, produced or

---

[1]     *See* Act of March 3, 1978, Pub. L. 6, No. 3 (codified as amended at 73 P.S.
§§ 1881-1889).

manufactured" in the United States. 73 P.S. § 1886. Because we hold that the Commonwealth Court improperly calculated the cost of the steel products at issue, we reverse and remand.

## I. The Steel Act

The United States' willingness to combat domestic economic concerns with protectionist[2] measures dates to the earliest days of the republic.[3] However, the modern trend of mandating the use of American-made products in public works projects dates to 1933 with the passage of the "Buy American Act,"[4] which directs that "only . . . articles, materials, and supplies that have been mined, produced, or manufactured in the United States . . . shall be acquired for public use." 41 U.S.C. § 8302(a)(1). In the following decades, several states enacted similar statutes mirroring the federal act,[5] and

---

[2] We intend the adjective here as descriptive rather than pejorative.

[3] *See generally* Tariff Act of 1789, ch. 2, 1 Stat. 24, § 1 ("Whereas it is necessary for the support of government, for the discharge of the debts of the United States, *and the encouragement and protection of manufactures*, that duties be laid on goods, wares and merchandises imported . . . ." (emphasis added)); *see also* ALEXANDER HAMILTON, *Report on the Subject of Manufactures, in* WRITINGS 647, 697-703 (Joanne B. Freeman ed., The Library of America 2001) (1791) (discussing the efficacy of tariffs, embargoes, and subsidies as means of protecting the United States' nascent manufacturers).

[4] Act of March 3, 1933, ch. 212, tit. III, 47 Stat. 1489 (codified as amended at 41 U.S.C. §§ 8301-8305); *see also Textron, Inc., Bell Helicopter Textron Div. v. Adams*, 493 F. Supp. 824, 830 (D.D.C. 1980) ("The Act was designed during the Depression as a device to foster and protect American industry, American workers and American invested capital; and for its first twenty years of existence it operated as a super tariff imposed on foreign manufacturers seeking to do business with the American government." (cleaned up)).

[5] *See, e.g.*, ALA. CODE § 39-3-1(a) (requiring all firms undertaking public works projects to "agree[] to use . . . [only] materials, supplies, and products manufactured, mined, processed or otherwise produced in the United States"); 30 ILL.C.S. 565/4 ("Each contract for . . . public works . . . shall contain a provision that steel products used or supplied in the performance of that contract . . . shall be manufactured or produced in the United States."); MD. STATE FIN. & PROC. CODE § 17-303(a)(1) (requiring that only "American steel products" be used in the performance of a public works projects); R.I.

Pennsylvania was no exception. In 1978, the General Assembly passed the Steel Act, embodying "the policy of the Commonwealth of Pennsylvania that all public officers and agencies should, at all times, aid and promote the development of the steel industry of the United States in order to stimulate and improve the economic well-being of the Commonwealth and its people." 73 P.S. § 1883; *see also id.* § 1882 ("This act shall be deemed to be an exercise of the police powers of the Commonwealth for the protection of the health, safety and general welfare of the people of the Commonwealth.").

Section 4 of the Steel Act provides:

> Every public agency shall require that every contract document for the construction, reconstruction, alteration, repair, improvement or maintenance of public works contain a provision that, if any steel products are to be used or supplied in the performance of the contract, only steel products as herein defined shall be used or supplied in the performance of the contract or any subcontracts thereunder.

*Id.* § 1884(a).

The Act's definition of "steel products" is at issue here. Specifically, we inquire whether a particular product that contains both foreign and domestic steel satisfies the domestic requirement. In relevant part, the Steel Act provides:

> If a product contains both foreign and United States steel, such product shall be determined to be a United States steel product only if at least 75% of the cost of the articles, materials and supplies have been mined, produced or manufactured, as the case may be, in the United States.

*Id.* § 1886.

Regarding payments for non-conforming steel products, Section 5 of the Act provides:

---

GEN. LAWS § 37-2.1-3(a) (requiring that "only steel products as herein defined shall be used or supplied in the performance of" public works projects); W. VA. CODE § 5-19-2(a) (requiring any aluminum, glass, or steel products used in public works projects be produced domestically).

No public agency shall authorize, provide for or make any payments to any person under any contract containing the provision required by section 4 unless, when unidentified steel products are supplied under a contract, such person has provided documentation including, but not limited to, invoices, bills of lading, and mill certification that the steel was melted and manufactured in the United States, which establish that such person has fully complied with such provision. If a steel product is identifiable from its face, such person must submit certification which satisfies the public agency that such person has fully complied with the provision required by section 4. Any such payments made to any person by any public agency which should not have been made as a result of this section shall be recoverable directly from the contractor, subcontractor, manufacturer or supplier who did not comply with section 4 by either such public agency or the Attorney General of Pennsylvania.

*Id.* § 1885(a).

## II. Factual and Procedural History

G. M. McCrossin, Inc. ("McCrossin"), a contracting and construction management firm, served as the general contractor for the Lycoming County Water and Sewer Authority ("Authority") on a project known as the Montoursville Regional Sewer System Waste Water Treatment Plan, Phase I Upgrade ("Project"). In July 2011, McCrossin entered into an agreement with the Authority to supply eight air blower assemblies, which move air from one area to another inside the waste treatment facility. In August 2011, McCrossin and the Authority agreed to a change order for McCrossin to supply and install three new digestive blowers to replace existing digestive blowers. The change order was approved, and United Blower, Inc. ("UBI"), became a subcontractor on the Project. UBI was to supply the eight blowers required by the original specifications and was to replace the three digestive blowers as required by the change order.

UBI prepared a submittal for the blowers which McCrossin in turn submitted to the Authority's Project engineer, Brinjac Engineering ("Brinjac"). As part of the submittal,

McCrossin provided Brinjac and the Authority with an ST-3 form,[6] which verified that 75% of the cost of the blowers was attributable to articles, materials, and supplies ("AMSs") that were mined, produced, or manufactured in the United States. The total amount McCrossin paid UBI for the blower assemblies and digestive blowers was $239,800. The amount paid by the Authority to McCrossin for these items was $243,505.

Authority employees began to question whether McCrossin and UBI provided products that complied with the Steel Act.[7] Ultimately, the Authority held a hearing on the matter on September 23, 2014. Thereafter, the Authority issued an adjudication in which it determined that, while McCrossin and UBI had not willfully violated the Steel Act, they had failed to provide steel products as defined therein.

McCrossin and UBI appealed the Authority's adjudication to the Lycoming County Court of Common Pleas. The trial court remanded the matter to the Authority to be heard by an independent hearing officer and directed the officer to issue findings of fact and conclusions of law for adoption by the Authority, which would nullify and supersede the Authority's previous findings of fact, conclusions of law, and adjudication. The Authority adopted the hearing officer's ensuing findings and conclusions, and issued its adjudication on December 6, 2017.

Relevant to the present appeal, the hearing officer addressed whether 75% or more of the steel products provided by UBI were manufactured in the United States as required by the Steel Act. To that end, the hearing officer examined a 10% deduction

---

[6]     The Pennsylvania Department of General Services developed this form for use in public works projects involving steel products as a means to ensure compliance with the Steel Act.

[7]     It is unclear when exactly the Authority first suspected a potential violation of the Steel Act. However, there is an email in the record from the Authority dated March 7, 2013, raising concerns over "what appears to be a significant portion of the materials being marked to have been made and/or assembled in China." R.R. at 857.

that UBI applied to the costs of blower components purchased from third parties. These third parties provided letters attesting that 10% of the costs listed on their invoices encompassed importation, warehousing, and shipping, while the other 90% represented the value of the foreign component being sold. Applying the 10% deduction, the total cost of the foreign components came to $59,655. Comparing that amount to the amount UBI charged McCrossin ($239,800), the hearing officer concluded that the foreign steel costs came to 24.88% of the total cost of the Project. This percentage was lower still if compared to the amount McCrossin charged the Authority ($243,505). However, the hearing officer found it inappropriate to allow the 10% deduction because the invoices did not itemize the specific costs of importing, storing, and shipping the components. Thus, without the 10% deduction, the foreign steel costs came to $67,340, which exceeds 25% regardless of the chosen denominator.[8]

The hearing officer also determined that the appropriate denominator was the amount McCrossin paid UBI, not what the Authority paid McCrossin. As the hearing officer explained:

> [W]hen determining the total cost of the steel product (the [denominator] of the equation), it is most appropriate to use the cost to McCrossin, not the cost to the Authority. Otherwise, simply by marking up the cost of the steel product more, the contractor could create a result that would result in a determination that the product is domestic rather than foreign. To comply with the requirements of the [Steel] Act, the cost to the contractor is the appropriate measuring stick, not the price that the contractor charges the customer.

Hr'g Officer's Adjudication at 12. Therefore, the hearing officer calculated the foreign steel costs as 28% of the total ($67,340 divided by $239,800).

---

[8] The hearing officer derived this total amount from Exhibit UBI-7, the handwritten notes of UBI's President, Wiekert Miolee. Reducing this sum by 10% yields $60,606, not $59,655. But using $60,606 as the numerator and the amount the Authority paid McCrossin ($243,505) as the denominator makes foreign steel costs 24.89% of the total, which also would qualify the blowers as United States steel products under the Act.

In sum, the hearing officer reached the following conclusions of law:

The blower assemblies contain both foreign and United States steel.

The blowers inserted into the pre-existing assemblies at the Authority's plant . . . contain solely foreign steel.

\* \* \* \*

Less than 75% of the cost of the steel in the blower assemblies and blowers, when considered as a unit, represent steel that has been mined, produced, or manufactured in the United States.

The blower assemblies and blowers, when considered as a unit, are not "United States steel products" as defined by the Act.

*Id.* at 14 (numbering omitted).

McCrossin and UBI appealed. On July 31, 2019, the trial court reversed the Authority's adjudication. The court found, *inter alia*, that the hearing officer and the Authority did not properly calculate the United States-based steel content of the blowers under review. The court held that the hearing officer should have taken into account evidence of UBI's vendors' "markups," and that, if this 10% of the total cost had been considered, the percentage of foreign content would have been lower than 25%. Thus, the trial court reversed the adjudication, and the Authority timely appealed.

In a unanimous memorandum, the Commonwealth Court affirmed. *United Blower, Inc. v. Lycoming Cty. Water & Sewer Auth.*, 1383 CD 2019, 2020 WL 3957316 (Pa. Cmwlth. July 13, 2020). The court began by analyzing whether 75% of the "cost" of the AMSs that went into the blowers was mined, produced, or manufactured in the United States, ultimately agreeing with the trial court's observations:

The term "cost" was not included in the original version of the Steel Act, and, in fact, was not added until the Steel Act was amended in 1984. No definition of "cost" is provided in the statute, but *Merriam-Webster Dictionary* defines "cost" as: "the amount or equivalent paid or charged for something" or "the outlay or expenditure . . . made to achieve an object." Although there is a dearth of guidance on the interpretation of the word "cost" in the

context of the Steel Act's definition of steel products, we view "cost," in light of its definition, to include a wide array of factors to be considered when assigning value to a product or service. Accordingly, it does not seem unreasonable to us that the Trial Court interpreted the Steel Act differently than the Hearing Officer when calculating the percentage of foreign steel in UBI's product.

\* \* \* \*

The Trial Court applied the law differently [than the hearing officer] to give effect to all aspects involved in the cost of the articles, thus recognizing a portion of same was attributable to value added domestically. The Trial Court determined that shipping and other costs should be included in the total "cost" of the articles, and if domestic in nature, should not be counted against UBI. This is consistent with the definition of the term "cost," which broadly includes all of the outlay/expenditure involved in achieving a final product.

*Id.* at *11 (footnotes omitted).

The Commonwealth Court then applied this understanding to the products at issue. First, the court agreed with the trial court's determination that the numerator for purposes of determining the foreign component of the product was $59,655. Regarding the denominator, the court continued:

[T]he Steel Act unquestionably puts its focus on the public agency's payment to the contractor. In the present matter, that would implicate the $243,505 paid to McCrossin by the Authority. However, here, it is not clear to us which total amount UBI was considering when it signed the ST-3 form, *i.e.*, the $239,800 it was paid by McCrossin or the $243,505 McCrossin was to be paid (and ultimately was) by Authority. Regardless, both calculations result in a foreign component under 25% ($59,655 divided by $243,505 results in a percentage of 24.5%, whereas $59,655 divided by $239,800 results in a percentage of 24.9%).

*Id.* (citation omitted). Thus, the Commonwealth Court held that McCrossin and UBI did not violate the Steel Act.

The Authority sought allowance of appeal in this Court. We granted review to consider the following question:

Did the Commonwealth Court err as a matter of law in affirming the trial court's calculation of the "cost" of steel products pursuant to the Steel

Products Procurement Act, 73 P.S. § 1886, that requires "75% of the cost of the articles, materials and supplies [of a steel product to] have been mined, produced or manufactured" in the United States?

*United Blower, Inc. v. Lycoming Cty. Water & Sewer Auth.*, 243 A.3d 972, 973 (Pa. 2021) (*per curiam*). This question is one of statutory interpretation and therefore presents a pure question of law. *Meyer v. Cmty. Coll. of Beaver Cty.*, 93 A.3d 806, 813 (Pa. 2014). Our scope of review is plenary, and our standard of review is *de novo*. *Id.*

### III. Parties' Arguments[9]

The Authority argues that the plain language of the Steel Act precludes a deduction for the importation, warehousing, and shipping costs of foreign steel products:

> There is nothing within the definition of "Steel Products" that allows a supplier to shave off from the total foreign steel cost amounts for importation, warehousing, marketing, and shipping costs incurred by a foreign manufacturer . . . . The focus of the calculation must be on how much money was paid by the supplier to the <u>domestic</u> <u>steel</u> <u>producers</u>, which amount must be no less than 75% of the total. There is nothing within the Act that allows amounts paid by the supplier to a foreign manufacturer to be included on the domestic side of the equation.

Authority's Br. at 22-23 (emphasis in original). Thus, the Authority maintains, the hearing officer correctly excluded these costs and calculated the foreign steel costs at the full $67,340. Using this sum as the numerator and the amount McCrossin paid UBI as the denominator ($239,800), the hearing officer properly determined that the foreign steel

---

[9] The parties argue issues that are beyond the scope of the present appeal. *See, e.g.*, Authority's Br. at 41-54 (addressing a number of alleged factual and legal errors that the Commonwealth Court did not reach); *see also* McCrossin's Br. at 24-30 (arguing that the Commonwealth Court's *dicta* regarding remedy was correct). In particular, both UBI and McCrossin raise the issue of whether the three digestive blowers included in the change order were provided gratis and, thus, should have been excluded from the cost calculation. UBI's Br. at 28-29; McCrossin's Br. at 20-21. While the trial court resolved this factual question in UBI's and McCrossin's favor, *see* Tr. Ct. Order, 07/31/2019, at 2 (unnumbered), the Commonwealth Court confined its analysis to the statutory question. Although these issues may be raised again on remand, they do not bear on whether the 10% deduction for domestic overhead of foreign AMSs and the choice of denominator were proper in calculating the cost of the products under review.

costs came to 28%. *See id.* at 23-25; *see also id.* at 34 (arguing that this formula "left no opportunity for manipulation").

UBI counters that, although neither the trial court nor the Commonwealth Court explicitly couched their analyses in these terms, the word "cost" as used in Section 6 of the Steel Act was susceptible of two or more reasonable interpretations, and the lower courts correctly resolved the ambiguity. *See* UBI's Br. at 26. UBI maintains that the Steel Act does not specify at what "level" the transaction costs should be calculated. "'Cost' could mean the 'cost' to the Authority [ ] or the 'cost' to the [c]ontractor. It could mean UBI's 'costs' or the 'costs' to UBI's suppliers." *Id.* at 26. UBI submits that "the Steel Act proscribes *only* the payment for non-complaint [*sic*] 'steel products.' There is no prohibition on the 'supply' or 'use' of non-compliant 'steel products.'" *Id.* at 27 (emphasis in original).

In that same vein, UBI claims that the Steel Act "provides no formulaic guidance and there is a dearth of decisional law regarding 'calculations.'" *Id.* at 31 n.20. While the Authority "has repeatedly argued that the Hearing Officer appropriately used the cost to the contractor and the amount paid to the foreign manufacturer as the measuring stick," UBI notes that "nowhere does the Authority state *why* this is correct." *Id.* at 31-32 (emphasis in original). Instead, UBI contends that both the trial court and the Commonwealth Court applied the correct interpretation of Section 6. *See id.* at 32.

Likewise, McCrossin argues that Section 6 of the Steel Act is ambiguous because the statute does not define the word "cost" and the word has not "acquired specialized meaning." McCrossin's Br. at 17-18. Consequently, the Commonwealth Court properly resorted to the dictionary to define "cost" as "'the amount or equivalent paid or charge[d] for something' or 'the outlay or expenditure . . . made to achieve an object.'" *Id.* at 18. In light of this expansive definition of "cost," McCrossin contends that both the trial court and

the Commonwealth Court properly considered the domestic overhead costs of the foreign steel products, because those costs unquestionably are outlays or expenditures in service of producing an American steel product. *See id.* As for the proper denominator, McCrossin argues that it is not the amount UBI charged McCrossin ($239,800), but rather the amount the Authority paid McCrossin ($243,505). *Id.* at 19. McCrossin supports this position by noting that "the Steel Act only prohibits public owners from 'paying' for foreign steel." *Id.* Thus, McCrossin maintains that, consistent with the Steel Act, the focus must be on what the Authority paid McCrossin, not what McCrossin paid UBI. Hence, the denominator of $239,800.

## IV. Discussion

Our interpretation of the Steel Act is governed by the Statutory Construction Act,[10] which requires that we "ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). The best indication of legislative intent is the statute's plain language. *Commonwealth v. Griffith*, 32 A.3d 1231, 1235 (Pa. 2011). Accordingly, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Words and phrases within a statute must be "construed according to rules of grammar and according to their common and approved usage," *id.* § 1903(a), and must be read within the context of the surrounding statutory language. *Gavin v. Loeffelbein*, 205 A.3d 1209, 1221 (Pa. 2019). We also are mindful of the General Assembly's own interpretive guidance regarding the Steel Act:

> This act is intended as remedial legislation designed to promote the general welfare and stimulate the economy of the Commonwealth and its people and each and every provision hereof is intended to receive a liberal construction such as will best effectuate that purpose and no provision is intended to receive a strict or limited construction.

---

[10]    1 Pa.C.S. §§ 1501-1991.

73 P.S. § 1887.

Section 6 of the Act provides that, should a steel product contain both domestic and foreign steel, "such product shall be determined to be a United States steel product only if at least 75% of the *cost* of the articles, materials and supplies have been mined, produced or manufactured . . . in the United States." *Id.* § 1886 (emphasis added). The Steel Act offers no definition of the word "cost," but it is a word with a "common and approved usage." Moreover, there is no basis upon which to conclude that it possesses a technical or peculiar meaning.[11] Notwithstanding UBI's and McCrossin's arguments to the contrary, this does not render the word ambiguous. Rather, "cost" must be construed according to its "common and approved usage." The noun "cost" means "the price paid to acquire, produce, accomplish, or maintain anything" or "an outlay or expenditure of money, time, labor, trouble, *etc.*"[12] On this definition, "cost" must encompass *all* aspects of the price paid to acquire the AMSs that make up a steel product. This would include not only the expense of the raw material, but also associated expenses, including labor, warehousing, marketing, transportation, and intermediary mark-ups—some combination of which savvy consumers—and more importantly for our purposes, legislators—understand are folded into the final cost to procure any finished product. The price UBI paid to acquire the AMSs that it needed to construct the blowers came at a cost comprising some combination of the above factors. To disassemble the complex machinery of commerce in the artificial fashion urged by UBI and McCrossin would

---

[11] *See Commonwealth v. Jarowecki*, 985 A.2d 955, 959 (Pa. 2009) ("We construe statutory language according to its common and approved usage, unless particular words and phrases have acquired a peculiar and appropriate meaning.") (cleaned up).

[12] *Cost*, DICTIONARY.COM, https://www.dictionary.com/browse/cost (last visited June 8, 2021); *see also Cost*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "cost" to mean "[t]he amount paid or charged for something; price or expenditure").

require us to depart from the statutory language, rather than reading it consistently with its common and approved usage.

That said, for the AMSs to satisfy the domestic cost percentage, Section 6 requires that at least 75% of the total cost of all the AMSs must come from AMSs that "have been mined, produced, or manufactured . . . in the United States." *Id.* UBI concedes that it sourced foreign AMSs from third parties, but it claims that 10% of the cost of those foreign AMSs reflect overhead for importation, warehousing, and logistics that occurred in the United States. While these overhead costs undoubtedly represent, as the Commonwealth Court put it, "value added domestically," that does not change the fact that the foreign AMSs were mined, produced, or manufactured abroad. Moreover, per the above definition of "cost," those overhead expenses are part and parcel of the cost of bringing the foreign AMSs to market in this country, and, as noted by the Authority, Section 6 does not provide for the winnowing of domestic overhead costs from the purchase price of the foreign AMSs that the lower courts embraced. *See* Authority's Br. at 22-23 ("There is nothing within the [Steel] Act that allows amounts paid by the supplier to a foreign manufacturer to be included on the domestic side of the equation."). One cannot ignore the absence of such a mechanism. *See Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1264 (Pa. 2020) ("[A]lthough one is admonished to listen attentively to what a statute says, one must also listen attentively to what it does not say.") (cleaned up). In short, the Commonwealth Court's observation that "cost" embraces a "wide array of factors" accords both with the plain language of Section 6 and with common sense, but it is equally clear that, absent a contrary statutory mandate, the unitary price that

encompasses those various expenses is indivisible.  Consequently, the 10% deduction of domestic overhead for the foreign AMSs lacks statutory authority.[13]

As for how to calculate the foreign and domestic cost percentages, Section 6 of the Steel Act does not say.  The fraction to be applied is straightforward, but the numerator and denominator are less obvious.  Two sums vie to serve as denominator.  UBI and McCrossin endorse the lower courts' view that the denominator should be what the Authority paid McCrossin, because the Steel Act "unquestionably puts its focus on the public agency's payment to the contractor."  *United Blower*, 2020 WL 3957316, at *11.  Hence, a denominator of $243,505.  The Authority, conversely, argues that this

---

[13] In his concurring and dissenting opinion, Justice Dougherty reasons that "domestic overhead is an element of the 'cost' of foreign steel that can properly be tabulated and deducted from the price paid and received therefor because it adds only domestic value realized by United States steel suppliers of foreign steel products."  Concurring and Dissenting Opinion (Dougherty, J.) at 3.  Respectfully, we disagree.  As explained above, the approach favored by Justice Dougherty, and adopted by the lower courts, lacks statutory authority.  Section 6 of the Steel Act does not authorize segregating domestic overhead from the cost of foreign AMSs.  To hold otherwise would engraft a new mechanism onto the Steel Act under the guise of interpreting it.  This is impermissible. *See In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712, 721 (Pa. 2018) ("[O]ur Court may not usurp the province of the legislature by rewriting [a statute] to add . . . requirements that . . . do not comport with the [statute] itself . . . .").

Furthermore, Justice Dougherty contends that "the primary reason why the hearing officer denied the 10% reduction for value added domestically (*i.e.*, overhead costs) was because the invoices for the foreign steel did not include that breakdown."  Concurring and Dissenting Opinion (Dougherty, J.) at 3.  Justice Dougherty concludes that,

> had the invoices from the United States suppliers to United Blower broken out the suppliers' charges for transportation, warehousing and the like, the reductions would have been permitted at the first level of review because they were properly set forth on the record.  In my view, this case should not turn on such a circumstance.

*Id.* at 3-4.  Unpropitious as it may be, the fact that this case turns on such a circumstance is no great anomaly.  Many cases hinge upon exactly the kind of unexpected "circumstance" that Justice Dougherty identifies here.  Moreover, the 10% deduction issue is subsumed by the larger issue this Court chose to review: whether the Commonwealth Court properly calculated the cost of the steel products under review.

denominator creates an "opportunity for manipulation." Authority's Br. at 34. As the hearing officer noted: "[I]t is most appropriate to use the cost to McCrossin, not the cost to the Authority. Otherwise, simply by marking up the cost of the steel product more, the contractor could create a result that would result in a determination that the product is domestic rather than foreign." Hr'g Officer's Adjudication at 12. Hence, a denominator of $239,800.

UBI and McCrossin are correct that the Steel Act focuses on the public agency's payment to the contractor in the context of an action to recover unauthorized payments. *See* 73 P.S. § 1885(a) ("Any such payments made to any person by any public agency which should not have been made as a result of this section shall be recoverable directly from the contractor, subcontractor, manufacturer or supplier who did not comply with section 4 by either such public agency or the Attorney General of Pennsylvania."). However, the recovery of unauthorized payments presupposes that the steel products supplied as part of a public works project violate the requirements of the Act. Before a public agency can recover an alleged unauthorized payment, a court first must determine whether the products are domestic steel products as defined in Section 6.

The statutory definition of "United States steel product" is conspicuously silent on the question of payment made by either a public agency or a contractor. Instead, Section 6 focuses on the "cost of the articles, materials and supplies." *Id.* § 1886. But the cost to whom? Given that "cost" means the price paid to acquire something, this language suggests that the correct denominator is the price paid by UBI to acquire all of the AMSs that went into the finished blowers, not the price paid by either the Authority or McCrossin for those blowers.[14] It was UBI that manufactured the blowers and, in doing

---

[14] In his concurring and dissenting opinion, Chief Justice Baer reasons that "[u]tilization of only the cost of the components paid by UBI to its suppliers as the denominator of the Section 1886 fraction fails to account for the cost of the fully

so, sourced all of the foreign and domestic AMSs required for the build. Pursuant to Section 6, 75% of the cost of those AMSs must come from AMSs that were mined, produced, or manufactured in the United States. As the entity that manufactured the finished blowers, UBI is best-positioned to identify the various AMSs used, substantiate their cost with invoices, and confirm whether they are domestic or foreign in origin.

Furthermore, as noted at the outset of this discussion, the Steel Act itself directs this Court to construe Section 6 liberally in service of protecting the domestic steel industry. *See id.* § 1887. This mandate supports our adoption of the total cost of all the AMSs as the denominator, rather than the price paid by either the Authority or McCrossin. This approach reduces the risk that the purchase price will conceal the true foreign steel content in a steel product.[15] Cutting off one avenue by which to subvert the remedial

manufactured product 'used or supplied in the performance of the contract,' as required by Section 1884." Concurring and Dissenting Opinion (Baer, C.J.) at 3. Instead, Chief Justice Baer would use the amount charged by UBI to McCrossin for the finished blowers as the denominator. *Id.* Respectfully, we must reject Chief Justice Baer's assertion. It is true enough that Section 4 of the Steel Act references those steel products "used or supplied in the performance of the [public works] contract." 73 P.S. § 1884(a). However, Section 4 goes on to state that only the use of those steel products "as herein defined shall be used or supplied in the performance of the contract." *Id.* The definition of a conforming steel product under the Act is found in Section 6, not Section 4. There, the Act provides that, "[i]f a product contains both foreign and United States steel, such product shall be determined to be a United States steel product only if at least 75% of the cost of the articles, materials and supplies have been mined, produced or manufactured . . . in the United States." *Id.* § 1886. Notwithstanding Chief Justice Baer's claims to the contrary, the definition of a United States steel product in Section 6 does not center upon the cost of the finished steel product. Rather, the plain language of Section 6 focuses upon the cost of the AMSs that make up the finished steel product and whether those AMSs were mined, produced, or manufactured in this country or abroad. Accordingly, the correct denominator is not the amount paid for the finished blowers, but the amount paid by UBI to acquire all of the AMSs required for the build.

[15] For example, imagine that a steel product retails for $1,000, but the AMSs that make up the product cost $500 to procure. In determining whether the product is a domestic steel product under the Steel Act, the retail price ($1,000) is irrelevant; only the cost of the AMSs matters ($500). If 75% of that total cost is attributable to AMSs that were mined, produced, or manufactured in the United States ($375), the product is a

intent of the Steel Act promotes greater use of domestic steel in accordance with the Act's protectionist[16] goals.

Finally, if the denominator is the total cost of all the AMSs, including both foreign and domestic AMSs, then the choice of numerator is either the total cost to acquire just the foreign AMSs or the total cost to acquire just the domestic AMSs. Either sum as numerator will produce a workable percentage. If using the former, a resulting percentage of less than 25% is needed to comply with the Steel Act. If using the latter, 75% or more is needed to comply with the Act.

For the foregoing reasons, the Commonwealth Court erred in calculating the cost of the blowers under review. Accordingly, we reverse the Commonwealth Court's order, and we remand for further proceedings consistent with this opinion.

Justices Saylor, Todd, Donohue and Mundy join the opinion.

Chief Justice Baer files a concurring and dissenting opinion.

Justice Dougherty files a concurring and dissenting opinion.

---

domestic steel product. With the total cost of the AMSs ($500) as the denominator, the product can contain $125 worth of foreign AMSs and pass muster. However, with the retail price ($1,000) as the denominator, the product could contain $250 worth of foreign AMSs and not violate the Steel Act. Thus, the price paid by a public agency or contractor for a finished steel product skews the cost percentages of the foreign and domestic AMSs, allowing greater amounts of foreign steel into public works projects.

[16]     *See supra* note 2.